The first two cases this morning, 15-1342 and 15-1343, are combined. We appreciate the parties' cooperation in that regard. And we'll hear from Mr. Countryman first, please. Thank you, Your Honor, and may it please the Court. There are several issues in these appeals, so I'd like to focus on just a couple in my time here today. First, I'd like to deal with two errors with respect to the 003 patent, one of claim construction and the other with respect to the Board's analysis of the Asahi reference. I'd then like to move to the Joinder issue, and I'll plan to rest on the briefs for the other issues unless the Court has questions about those. So starting first with claim construction on the 003 patent, the Board's error here was that it ignored an explicit definition in the specification. All the 003 claims require a stereoscopic panoramic mosaic image pair. The specification of the 003 patent— Can I ask you this? Yes. Suppose, for purposes of this question, that I agreed with you that the Board's claim construction was wrong, not even necessarily because that sentence is a definition, but because it very strongly informs the proper reading of the claim language. Nevertheless, why didn't the Board, in fact, make findings under the correct construction that lead to support its ruling? So there's one issue in particular in that regard, Your Honor, with respect to the Asahi reference. So Asahi was the only reference that was used to invalidate Dependent Claim 3, and there the Board made no finding that under our construction that the images were recorded from slightly displaced positions in Asahi. But that's the one piece that I'm not sure that, unless you get a definitional characterization out of that sentence, that would otherwise be supported. Well, that's a different claim construction, right? The slightly different, right? I would say it's part of this, Your Honor, because it's part of the definition of stereoscopic images. So stereoscopic images have to have two characteristics. They have to be recorded from slightly displaced positions. And you say that it has to be the distance between the human eyes, right? That's correct. Suppose we reject that. Where are we then on the alternative construction? So then the issue would be, with respect to Asahi, were the Board's findings that it provided a sense of depth supported by substantial evidence, and then likewise with respect to the other references? And then with respect to the Kawakita reference, the issue would be, did the Board make findings to support the idea that it provided a sense of depth for the entire scene? And in that regard, I think the problem was that the Board really engaged in a 103-type analysis, when the rejections here, or the rejections in the presentation. So with respect to the Asahi reference, the Board didn't identify any express disclosure in Asahi where it showed images that provided the sense of depth to the human. Asahi or Kawakita? Asahi. And so what the Board did was it looked to Sony's expert testimony that, well, adjustments could be made to the images. And if you adjusted  the images, you could make adjustments. So the issue is whether adjustments are precluded. That's correct, Your Honor. And we're talking about adjustments that aren't done by the processor, right? That's correct, yeah. And Kawakita is actually a good example of that, because Kawakita in particular talks about making adjustments with humans. Ten research personnel there were needed to adjust the images in order to give a sense of depth for the entire scene. But doesn't your construction depend on the word such that, so that you read the display step in the 264 as requiring that this be done by the processor? So there's a couple things on that. That's one of our arguments on the 284 patent, Your Honor. The other argument is that the claim language itself links the mosaics of the scene together in those two elements. So the processor talks about generating a plurality of mosaics. And then the display element talks about displaying the mosaics. And so our point would be that when the claim says displaying the mosaics, it has to be referring to the same mosaics that were generated by the processor. Well, it says and displays them so as to provide a sense of depth of the scene. That's where the depth of the scene comes in under the display limitation, not under the processing limitation, correct? I don't agree with that, Your Honor, because the images themselves have to be able to provide that sense of depth. So all the display is taking the images that the processor has already generated and it's just displaying them so that they have a sense of depth. But you still have to have images that are capable of being displayed, capable of providing a sense of depth when they're displayed. And the problem with this prior art is that it doesn't disclose images that are capable of providing that sense of depth because it's not for showing stereo. It's for calculating these types of images. Is that really true of Kawakita? I mean, I thought that the board's description of Kawakita, reflecting what it said, was that it pointed to the need for adjustment in certain instances, but that in other instances, images created by the Kawakita system would, in fact, meet the kind of common sense definition that they are capable of providing a sense of depth to the scene as a whole. Yes, so the board did distinguish those two cases in Kawakita. With respect to the latter one, the issue was that it was talking about instances in which the camera was far away from the scene and so there wouldn't be any sense of depth to perceive because the objects would be so far away that when you're looking at the image... Well, here's what I guess I'm remembering and I don't have it in front of me. I thought, roughly speaking, there were three things Kawakita was describing. One, a set of images for which nothing would need to be done. And then it says, and then there are two instances in which you might need to do something. And I thought the distance one was one of the two things for which you might need to do something, but that the first group, Kawakita, is described by the board as disclosing images that you don't have to do anything for and still a viewer, when viewing, would get a sense of depth of the scene as a whole. And so our view on that particular part of the story was that the camera wouldn't get a sense of depth because the camera is so far away from the images that there wouldn't be any depth to perceive. So that was the problem. What Kawakita was saying was, well, I don't need to adjust in that situation because there's no need to make the adjustment because no one can see depth anyway. There's no depth to perceive because the camera is so far away. How do we know that? I mean, that's your interpretation of the reference or did you put in a declaration? That's our interpretation of the reference, Your Honor. But the reference doesn't say what you just said, right? I think it does, Your Honor, because it's talking about these two situations. And I think in that it's contrasting the situation in which the camera is relatively close. And in that case, it talks about needing to make the adjustments as opposed to the other situation in which you don't need to make the adjustments. We would say it's implicit in the reference that that's talking about the camera is so far away. And Sony's expert had admitted that there are these situations in which you have this degenerative sense of depth because the camera is so far away that you can't perceive any depth. And Sony's expert in particular talked about that situation just generally about this degenerative sense of depth in his declaration, his second declaration at A1575. And then he again mentioned it in his deposition testimony at A1806-07. So that's our view, Your Honor, is that if the court goes with our claim construction on the 003 patent, then in particular, the slightly displaced, that that is an instance in which the board did not make any findings under our construction. And that at least with respect to claim three, the anticipation finding would have to be set aside. And even on the slightly displaced, your view, even if we were to accept that as part of the claim construction, your view then would be that the board could not read or apply slightly displaced to the helicopter motion where, you know, the hundred foot or something distance between shots is pretty slight compared to the distance to the object being photographed. That's right, Your Honor. I would characterize it more as an issue of construction in the first instance as opposed to application of the construction. Because, you know, of course, if it's an issue of construction, it's a question of law. And really the question is what's the scope of these patent claims? No one is disputing the content of Asahi. It's really a question of what does slightly displaced mean in that definition? And we would say that that's an issue of claim construction. It's reviewed de novo. And the patent repeatedly talks about displacements that are approximately the distance to the human eyes. Figures 1A and 1B show that. There's a couple instances in the specification which talk about that. The board's only basis in the patent for going elsewhere was there's a sentence that talks about exaggerated stereo at column 7. But even in that instance, you're talking about, okay, maybe something that's a little broader than the human eyes. So the human eyes are about two and a half inches apart. In Asahi, we're talking about distances when these images are being recorded from this helicopter that are, you know, tens or hundreds of feet apart. And so you're talking about a three order of magnitude difference. In our view, that's not just the ordinary sense of the word slightly or how it's used in this patent. And the board's error was that it went to Sony's expert and to some of his extrinsic evidence to look and come up with a different definition of slightly displaced. But as a legal matter, the court and the board have to start with the intrinsic evidence. And here, where the intrinsic evidence is clear and shows that it's just approximately the displacement between the human eyes, it was improper for the board to go to Sony's extrinsic. Isn't there something in the specification, and maybe I'm misremembering this, where in the description of the, I don't know, the radius of the visual circle, is that the term? Yes. Yes. Where it says ordinarily, that's about the distance between human eyes, but then there's a sentence that says, but in fact, it can be larger. Yes, Your Honor, that's the sentence of column seven. But what it says is, if you want exaggerated stereo, you can make it larger. But in the context of that paragraph, what it's saying is that, okay, you can make it a little bit larger than the human eyes, but you can't make it, there's nothing in the patent that suggests that you would make it many, many, many orders of magnitude larger. But I think the suggestion is that it is slightly displaced relates to the distance. Right? That's right. And I think we would say that just the ordinary meaning of slightly means that it's got to be, in the context of this patent, approximately the distance between the human eyes. Can I switch topic and ask you some things about the joinder? Sure. So do I understand correctly that when the petitions that resulted in the 326 and 327 IPRs, I guess the follow-on petitions, were filed, in your opposition to those, you did not say these are untimely under 315B and therefore they should not be instituted. I couldn't find that. What you did was oppose joinder, but you didn't oppose institution. That's correct, Your Honor. We didn't oppose joinder. I think the thing, we did oppose joinder, we didn't oppose institution. I'm kind of trying to figure out how several things fit together here. If institution is unopposed and is unreviewable, is unreversible, if only because it was unopposed, then why could not the board have gotten to exactly where it got to here by simply consolidating the proceedings, consolidating them under 315D, never mind 315C? I don't understand why there's any need to discuss in this particular case, putting aside other waiver arguments, which we know exist, the scope of 315C. Consolidation of an unreviewable institution proceeding gets to the same place, doesn't it? Well, consolidation isn't part of the exception to the one-year bar, so I think that's what I would say, was the board would be acting ultra v-race if it would have tried to consolidate the proceedings and then institute the 326 and 327 petitions. I assume you only consolidate after you institute, but I'm taking as a premise now that the 326 and 327 were instituted and we can't reverse that for a variety of reasons, unreviewability, the fact that you didn't oppose institution 326 and 327. So taking that as a given for purposes of this question, why isn't what at a bottom line the board did here was to consolidate these two proceedings? I realize it didn't talk in those terms, it's not argued in those terms, but I'm puzzled about why that isn't what the net result is here, wholly apart from any implicit or explicit limitation in 315C about One, as you noted, the board didn't say it was consolidating, it said it was using Joinder. Two, I would say even in the situation in which if the board were to say it was consolidating, we could have sought mandamus at a minimum, and so I would say that the court would be able to review that under its mandamus jurisdiction for many of the same reasons that we've explained here. If you have IPR petitions that are clearly filed after the one-year time bar, there's no for mandamus would be satisfied. The right to the writ would be clear and indisputable, there would be no alternative remedies because, of course, there wasn't a direct appeal available, and it would be appropriate under the circumstances because the board would just be flouting a statutory command. But I mean, I think in Closo, did we not leave open the door that maybe mandamus, that this would ultimately be unreviewable, leaving open the door for possibility of mandamus in certain circumstances, but we haven't yet decided that mandamus would necessarily yield, right? That's right, Chief Judge Prost, and I would say that this is the case, that mandamus would be appropriate. Well, does that suggest that you're giving up on the appealability argument in light of Acades? It doesn't, Your Honor. We believe that Acades is distinguishable for a couple reasons, the main one being that this is, the interpretation of something that's applicable to just a particular petition. Yeah, but this is just like Closo or Acades in the sense that if the thing had been timely filed, there wouldn't be any problem. And those cases suggest that at a minimum, the appealability bar applies where you could have, if you'd filed earlier, you would have been properly there. So this is just like that, isn't it? I disagree, Your Honor, because the challenge here is not to the institution or the one-year bar, it's to the joinder statute, and here we're making a generally applicable point about the joinder statute, that you're not allowed to join claims, that the joinder statute just permits joinder a party. But how is that different than the Acades, the one-year bar statute? What makes that different? Because it goes to the board's power to act in the manner in which it did in this case. So the board could not have put in 326 and 327 petitions if it hadn't joined them to this proceeding. The joinder statute was a necessary decision underlying what the board did to get to its final written decision. Well, what the joinder statute does, it says you don't have to worry about timeliness if there's a joinder, and we said timeliness is an institution decision which we're not going to review. But what we would say that this court should do, Your Honor, is just decide that the board didn't have the power to join and then remand for the board to look at institution in light of, again, in light of the fact that it doesn't have the power to join these proceedings. And then it would ultimately be the board. And your argument about joinder is based on the fact that this was the same person and not a different person? Two things, Your Honor. Yes, one is that, and then the other is that the statute doesn't specifically provide for the joinder claims. It just provides for joinder a party. And so there's no statutory authorization for what the board did with respect to joinder here. If it were a different party, could the different party be joined along with different claims? No, Your Honor, because Section 315C only speaks to joinder claims. And so in that respect, its language parallel Federal Rules of Civil Procedure 19, which talks about joinder parties. There's a different Federal Rule of Civil Procedure that talks about joinder claims. There's no statutory authorization for the board to join claims. Can I, I think I know the answer to this, but this is one of those fairly infrequent cases in which what we'll call the board in one or another proceeding arrived at a policy position through what might be considered panel stacking. You haven't challenged that, right, under either APA or statutory or due process grounds of the sort that were talked about a bit in the dissent in Allapatt? Right. We've not in this case, mainly because it wasn't presented in our case below. But I would say when you're thinking about what kind of deference, if any, to give to the PTO, I think it speaks to the fact that the court needs to look at the statute de novo and not give any deference, Chevron or otherwise, to the PTO because the PTO is balancing from position to position. There's not really a reasoned agency approach to this. I see I'm running out of time. No, that's fine. Save that and we'll restore to it additional minutes for rebuttal. Thank you. Okay, Mr. Hanley. Good morning, Your Honors. May it please the Court. As it turns out, the priorities that I set for the limited time I have turn out to be not the same as the priorities that Mr. Countryman set out, which is basically to address a couple of claim construction issues. The first one, of course, being the Board's final construction of stereoscopic image pair and also to address the construction of slightly displaced positions in the Board's preliminary construction, which I should point out, I think as the Board has noted, the Board made findings of unpatentability under both the broader construction in the final decision and also the narrower construction in the preliminary decision. And so even if the Court were to determine that the Board erred in construing stereoscopic image pair in the final construction, the Board's alternative findings are certainly supported by substantial evidence and the Board should be affirmed nevertheless. The third priority I have, of course, is to address joinder. So going first to the issue of stereoscopic image pair, what happened was the parties basically agreed on a construction. The Board made a determination in the institution decision that that construction was consistent with the ordinary meaning. The Board looked at a And then when time came for the evidence to be presented and for the oral hearing to occur, the Board was confronted with a different ordinary meaning that, in fact, was advocated by GISSOM, GISSOM argued the broader construction of stereoscopic image, and the experts for each side supported that. So the Board confronted with that and said, okay, that is the proper construction. I may not be remembering the details. I thought that the gist of the disagreement here is that the Board adopted a construction that would allow images to be stereoscopic if they would not, in fact, be seen as having depth perception by human eyes, by a human being with two eyes in the normal place, but might be viewed that way, whatever viewing means in this computer, and that the gist of the argument on the other side is that both the sentence that they want to call a definition, but in any event, the whole spec as a whole tells you, in the context of this patent, that's ridiculous. This is about what human beings will see. That is your position, but what's wrong? Why is that not right? Well, certainly the backdrop is that, start from first premises. The interpretation of a term is from the viewpoint of a person of ordinary skill in the art. So the person of ordinary skill in this context, in the context provided by the whole document, and the whole document is about what human eyes will see. Well, certainly the embodiment that's discussed, and the only embodiment that's discussed, is an embodiment in which two images are going to be generated that are for human viewing. No question about that. The board did note that at the tail end of the specification, where typically patent owners are talking about an enlarged perspective... That this would be useful for computer games. Or in robots. And in robotics, the only example the board had of robotics was the party's presentations related to Ishiguro, which has to do with robot navigation. And so, in that context, the primary function is for the robot to measure distances. And the board, I think, properly viewed that as an example of a broader usage of the term that goes beyond what's appropriate for human viewing. But this is only under this alternative construction, right? Well, this is under, right, the board... In other words, the board did address the claims under the assumption that it requires human depth perception, and concluded that that was satisfied by, one, under some circumstances you would get it anyway in the prior art, and two, because in the prior art, you get it as a result of human manipulation, and that that is permissible under the claims. Correct. And we spent most of our brief addressing that very issue and pointing that out. If I could just make one more point on the board's final construction in support of it. Basically, the board looked at the claim, Claim 1, which was the only one about which there was a system claim that has two elements, and it has a strip generator and a mosaic image generator. And within the mosaic image generator element, it basically says you get two mosaics, and those mosaics comprise the stereoscopic image pair, providing a stereoscopic image of the scene as recorded over the path. So the claim itself bespeaks a broader construction of stereoscopic image pair, particularly stereoscopic image pair is the outcome of the functioning of these two elements that comprise the system. So the claim is certainly consistent with the broader interpretation. It's only if one goes to the specification and one makes a determination that there's a special definition that departs from the agreed-upon ordinary meaning that you get to this notion that you have to have images for human viewing and so on. So if I can now go to the second part of the claim construction, which is this slightly displaced. Slightly displaced positions is part of the board's preliminary construction. And here, two things as a threshold matter. First, as I said, it's the meaning that that term would have to a person skilled in the art, knowing what they know and what they bring with them into the analysis and their reading of the patent. And secondly, it's the broadest reasonable interpretation of that. So here we have the board looking at the patent specification and noting that the patent itself says that the diameter of the viewing circle, which is basically the displacement of the two stereoscopically enlarged or exaggerated stereo. It doesn't place any limitation on that. It doesn't say, as Mr. Countryman suggests, it can only be enlarged a little bit. But it also doesn't say it can be enlarged for purposes of unexaggerated stereoscopic viewing, does it? I'm not sure what unexaggerated means, Your Honor. Well, what do you think exaggerated means? Well, the board heard evidence about that. And this goes to my point that this is the viewpoint of someone skilled in the art. The board received evidence about what someone skilled in the art knows about how to create stereoscopic images that are viewable and will provide a sense of depth to a human. And in particular, the board learned about the concept of disparity, which basically is the relationship between the distance between the photographic positions and the distance of objects. And that disparity, therefore, a proper disparity can exist for humans to view a stereoscopic image pair with photographing positions that are widely displaced because that displacement is appropriate for the distance of the objects being photographed. Which doesn't have anything to do with the exaggeration? Well, exaggerated, what it has to do with is this. The patent uses the term normal stereo. Normal stereo is the stereo that mimics the experience that a viewer would have in looking at a scene natively. Well, what I'm trying to understand is whether the exaggeration point is the same as the distance from the object point that you just made, or it's a different point in the specification. Well, what I'm trying to do is explain what exaggerated means. Just tell me first, are we talking about a single point in the spec or two different points? Well, we're talking about a single point in the spec where that concept is mentioned. But it's a single concept. And it's that the distance is related to the displacement. Yes, it refers to the ability to spread the displacement between the photographing positions for exaggerated stereo. And just to round out what that means, Mr. Barton, the photographer who testified, had as an exemplar of that. He showed or testified about an image of two distant mountain peaks captured using cameras 100 feet apart, much wider than the distance between human eyes. And if one looks at that using red cyan glasses, one will see a separation between the two peaks. And the separation that one sees in looking at those images is not what one would see in looking at the scene natively. One sees a separation that one would not see looking at the scene natively because one's eyes aren't 100 feet apart. So it creates a stereoscopic image that does not mimic the direct experience a viewer would have in looking at the scene. That's what exaggerated stereo means. And that's what Dr. Garrow testified about. So that reference to exaggerated stereo is consistent with the evidence the board received about what people skilled in the art know about the technology creating these images. About Asahi, Asahi does, in fact, teach, disclose stereoscopic images that, when viewed, would provide a perception of depth. Asahi says that under certain flight conditions, you generate mosaics. And the mosaics, stereoscopic viewing is possible using the mosaics. And that's all that's required in the 003 patent. I think, as Mr. Countryman said, it's about the capability of the captured images, if properly displayed, to produce this perception of depth. Asahi says stereoscopic viewing is possible. Dr. Garrow testified that one skilled in the art would understand viewing, to refer to human viewing. And therefore, Asahi does disclose images that provide a perception of depth, when viewed. If the board does have any questions about that, I'd like to go on to the joiner. You're at a higher level now. Pardon, Ron? You said the board. Oh, the board, the court. Thank you, Garrow, for correcting me. About the joiner question, I agree with you, Judge Taranto, that there was no below at the board level. There was no challenge to the institution decision with respect to the second petitions. There was a challenge to joining them with the first petitions on the basis that the director should not exercise his discretion, because they would prolong the proceeding, and so on. There were these factors relating to the appropriateness. Well, can I just ask you, do you see any difference in between what the board ended up doing here and what the board would have done had it simply said, we institute, we interpret 315B, the timing rule, a particular way. We now consolidate. I don't see any difference. I think the viewpoint that Your Honor has expressed about what happened is an appropriate analysis. I hope it's evident that one reason I'm asking is that it seems to me there's quite a lot of force to their joiner argument. Everybody, every lawyer who's passed the sixth week of first-term civil procedure knows the difference between joining parties and joining claims, and this says joining parties. Yeah, but can I address that? Please. Yeah, okay. So what I think is missing there is the following. The joiner statute talks about joiner of party, uses those languages, and says any person who appropriately files a petition under 311. So under 3 itself, Mr. Countryman is suggesting that a second party, let's say Apple as a for instance, piggybacked on the Sony's initial petitions, and they attacked additional claims. Mr. Countryman's point of view is that, albeit they are a different party, they could not do that because the joiner statute doesn't allow joiner claims. However, if you look at the requirement of the joiner statute, and specifically that it requires that the petition satisfy the requirements of 311, 311 is a preliminary examination of the merits of the petition. It requires a finding that there's a reasonable likelihood that at least one claim will be established to be unpalatable. So if you have an ongoing proceeding where the board is instituted and therefore has already made that decision with regard to the subject matter of the petition that precipitated it, then what is the utility of the board looking at joining an additional party and examining whether or not they have met the threshold of showing at least one claim is additional claims, therefore additional issues can be added. Well, can I, maybe I'm going to try to get at this a different way. If I'm right in my current working hypothesis that the consolidation provision allows the board to put together two proceedings that it thinks are sufficiently closely related that they should be litigated together, what is the role of 315C? What does it add to that authority? Well, one thing clearly it adds is that a party who is within 315C can be one for whom the time bar has already expired. How would that fit under the 315C says something like the only parties that can join are ones that properly filed petitions? Correct. And why doesn't that preclude the out of time petitioner? Well, because 315B says that the parties joining under 315C... Properly filed is only properly under the other provisions, not under 315B. It's properly filed under, it says under 311. Yeah, which is my point as to why joined of issues... So the out of time petitioner can be joined even though you wouldn't have a consolidatable pair of timely proceedings, timely brought proceedings. Correct. The out of time petitioner can be joined not with... Well, it's another way of saying it can be joined not withstanding the time bar, which is what's clearly... If I can say one more thing about... I'm sorry. I think we're going over time. Make one point. Acades. It seems to me Acades is dispositive that the challenge here really is to the time bar that they're saying these petitions were time barred. Acades addresses the time bar, says that the fact that the board made a determination that the time bar didn't apply, that's not reviewable because that's part of the institution's decision. And moreover, just looking at the other statute, 319, 319 allows appeals of final written decisions, which in 318A are final written decisions that relate to patentability. So it seems to me this is not a patentability challenge when they're challenging joinder or institution. Okay. Thank you. Thank you, Your Honor, and may it please the court. I agree with my friend from Sony that this court does not have jurisdiction to review the agency's decision to institute the later filed IPRs. The, Yeson tries to get around the Acades case by saying that it is, what is really being reviewed here is the final written decision as to claims that were not in the proceeding until they were, until the second petitions were instituted and they were, the proceedings were joined. Just very basic. Is the office's position that may join a party, two questions, that may join a party can be the same party that's already instituted? And is the office's position that may join a party necessarily, or at least allows that additional claims will be asserted by that party? Yes, Your Honor, to both questions. On the first question, it says may join as a party, any person who properly files a petition. And while join as a party would suggest ordinarily that it's party joinder that's allowed, but it does, the statute goes on and evaluate and tells the director to evaluate the propriety of the petition that's filed. Look at it and decide whether or not it's something that could be instituted. And if so, the director can join the proceedings. And so it's... Can I just, I'm trying to, I think I'm maybe beginning to understand this. It seems to me, and tell me why this is wrong, that 315C is about joinder of parties to instituted review number one without instituting review number two. Because if you instituted review number two, there'd be no role for the joinder provision. Everything could be consolidated. So the only function of 315C is to allow a party whose second, whose request to institute proceeding number two, could be a different party, could be the same party, not my point here, does not in fact have that second one instituted. Otherwise, it would all just be consolidating two perfectly properly instituted proceedings. I think that 315 is a little bit circular in that B says, only if you join under 315C and 315C says you can, it doesn't apply if... C does not require the second proceeding to be instituted. Only that it be one that the director determines meet the non-timing requirements for institution. Right. But it says that what it's, the purpose of 315C is to let someone who is otherwise time barred under 315B get into the proceeding. And the director looks at that petition and decides whether or not it's institutable. And although... So the joinder here, maybe even, should not have been coupled with the institution of 326 and 327 proceedings. What role is played by the institution of the 326 and 327 here, as opposed to simply joining Sony to the 318, 218 and 219? The joinder of the institution of the second petition allowed Sony to bring forward different arguments about different claims. That would otherwise be time barred. That would otherwise have been time barred. Why would, it strikes me as odd that the statute would have done that. I mean, I can understand joining a party who delayed in instituting, who's challenging the same claims. But why would Congress have wanted to frame this in a way that somebody could bring in new claims that would otherwise have been time barred? The reason for that is that the patent owner is in an IPR proceeding and there are, it knows its patent is in jeopardy. And it allows either the same party, if new claims are asserted against it, or other parties to get involved in the proceeding and bring their claims against the same patent into the single proceeding that moves forward. So the patent owner has all of the challenges that all parties have against its patent resolved in the single proceeding. And the reason that we think that Sony can join into its own proceeding is because the statute just says any person who properly files a petition, and the way we read it, that allows other parties, and the way Senator Kyle in the legislative history says, it allows other parties to bring in new issues. And if other parties can bring in new issues, the statute is ambiguous as to whether or not the same party can. And we've interpreted it in a way that allows... Who's the we that's been doing this interpreting? It's been interpretation through the board, by the agency. Where does the board give an interpretive authority? The director... And by the board here, I mean, you know, the 8 million possible three-judge panels, plus how many other five-judge panels that resolved after the director or her delegee decides she doesn't like the result of the original patent. Right. So the director has delegated the authority to decide institution decisions to the board. And to get to Your Honor's earlier question about Allopat, it's especially appropriate in this situation that the director be able to make sure that her policy judgments are enforced by the board. So it's particularly appropriate in a situation like this, where the director has the ultimate authority to expand... What happens if another board tomorrow or yesterday decides in a different way? If another panel were to decide... You're not bound by the interpretation given by the particular panel that decided this case, right? No, none of these decisions has been made precedential at this point. Do you know of... Because I don't at this point. ...know of any other individual adjudicatory multi-member panel board decisions outside the PTO context where non-precedential decisions have been given Chevron or other kind of deference? I'm not aware of any cases where non-precedential decisions have been given Chevron deference, but I don't think that... There are cases where non-precedential decisions have been given Chevron deference, but I think Judge Toronto's point is none of those cases involve multiple entities that could make the decisions. Right. And it seems a little bit peculiar, given the sheer number of permutations of three judge panel opinions, that Congress meant to delegate to each one of those the ability to interpret its statutes, and particularly where it hasn't done so through a process that makes it binding on the agency. I think that Meade suggests that whether or not a particular decision is made precedential does not matter in the Chevron inquiry, as long as the agency does, in certain circumstances, consider its decisions binding. And there are precedential decisions. The board is... But here there's no dispute. These aren't binding on anyone, right? That's correct. This decision... So what kind of deference are you advocating that we give to these individual non-precedential board decisions? Well, first of all, I'd say that our position is that this court lacks jurisdiction to review the decision at all, so there's no question of the level of deference it should give. But I think the agency is showing that it is, in fact, using its best efforts to speak with one voice and to have aberrant decisions... Congress sort of said how the director is supposed to speak with one voice, but through a delegation of initial decision-making authority to any number of possible three-member panels of APJs, none of whose decisions is binding on anybody else without notice and comment, rulemaking, or any other formal process, that's a little odd. It may be a little odd, Your Honor, and I would point to Microsoft e-Proxicon, which says that even if it is, in fact, a little odd, it is an appropriate thing for the agency to do is, through case-by-case adjudication, reach the result it wants to reach. Yeah, but we're talking here about the level of deference that the office... The position of the government with respect to what deference is owed to this particular board decision, assuming we can review... This particular panel's decision with respect to what Joinder means. Well, I understand Ism's argument as conceding that Chevron deference would apply unless, in its view, the agency has been acting very inconsistently, and my response to that argument is that we agree that Chevron deference should apply, and we think that the agency is doing its very best to speak with one voice, and there's really only one outlier decision, the Skyhawk decision, and there are over 20 decisions involving Joinder where... And any time there has been a seeming other outlier, you've engaged the power to reconfigure the panel so as to get the result you want? Yes, Your Honor, the... And you don't see a problem with that? Your Honor, the director is trying to ensure that her policy position is being enforced by her counsel. The director is not given adjudicatory authority, right, under Section 6 of the statute that gives it to the board. Right. To clarify, the director is a member of the board, but Your Honor is correct that she's... Right, but after the panel is chosen, I'm not sure I see the authority there to engage in case-specific re-adjudication from the director after the panel has been selected. Well, that's correct. Once a panel has been set, it has the adjudicatory authority, and the director has to be... The director has to be set by adding a few members who will come out the other way. That's correct, Your Honor. We believe that's what... How do we determine... Who determines whether a decision is... I mean, if a decision were designated as precedential, then all other board panels would be bound by it, right? Yes, Your Honor. Who makes that determination? It is a somewhat complicated process where the board holds a vote, and it has to... Someone has to bring it to the board's attention, and it can be the board itself or someone from the outside requests that a decision be made precedential. Why wouldn't a PTL make some of these decisions precedential, which seem to rest on broadly applicable issues such as joinder? Why are we faced with non-precedential decisions on that kind of issue? I think that the agency is considering making more decisions precedential. It's a slow process. Does the director have authority to do that? Does the chief administrative law judge? You mentioned a vote. Do 250 board judges get to vote on what's precedential? Yes, Your Honor, and that's... Seriously? It's a complicated process, and a majority of the judges have to vote to make the decision precedential. Then the chief administrative patent judge decides whether or not to forward the decision to the director, and the director has the ultimate authority to decide whether a decision         It is. It is. It is. It is. It is. It is. It is. It is. It is. It is. It is. I... It does seem sort of cumbersome. But in the absence of a precedential opinion, then, if a board comes up any... Anywhere they go, you're saying one board decides joinder one way, another board panel decides it another way, and we're supposed to give Chevron deference to every one of them? If that's the way it works out? I mean, either Chevron deference applies in the circumstance or it doesn't. So if they're two different opinions, two coming out different ways on joinder, we're supposed to give Chevron deference to each of those? Your Honor, it's... The answer's got to be no, right? It's particularly complicated in this case because the one... The agency's position is that the statute is ambiguous. The judges who come out the other way say the statute is unambiguous, and so Chevron wouldn't apply. But I don't mean to challenge Your Honor's question, but... We've got a lot more panels going on. We may get one that says it's ambiguous and we go the other way, too. That's possible, Your Honor, and what the agency would do in that case would be to exercise its authority to try to bring that panel's decision in line with the agency's view. Can I ask you one other question? I think I know the answer. This is about 315B. Has the director or any board panel said... This has to do with claim filing versus patent filing. So if an IPR challenges a particular claim, whether the one-year period can be measured from when that claim was alleged to be infringed in court, even if infringement of the patent was more than a year ago? Yes, Your Honor. The 315B says it goes to the entire patent, and so if any claim in the patent has been asserted... And neither the director nor panels, one way or the other, have said, well, actually, it makes more sense to construe that timing rule to run from the time that the challenged claims were asserted in litigation? No, Your Honor. The board has consistently held that it is required, that it affects the entire patent rather than claim by claim. And so under that view, the fact that in the Delaware litigation filed by Yisum, there was no identification of claims is completely irrelevant to whether the 315B bar applies. In fact, the 315B bar did, in fact, bar the 326 with the... 326 and 327. 326 and 327. They were simply out of time. Well, under the first sentence, Your Honor, it's correct that the petitions were barred, but the second sentence takes that away when a jointer decision is made. So it says the bar no longer applies when a jointer decision is made. I don't know if there are any further questions, but I'll pass my time. Thank you. All right. We went over for the other side, so let's give you six minutes if you need it. Thank you, Your Honor. Just a few points. First on claim construction. So to start back with the slightly displaced, everything in the patent is consistent with slightly displaced being approximately the distance between the human eyes. The only thing that Sony pointed to was the one sentence in the specification that refers to exaggerated stereo, but that, in the context of the rest of this patent, is just talking about exaggerated and being a little bit larger than the space of the human eyes. So there's nothing in the patent that would suggest that it could be many orders of magnitude larger than the human eyes. And so, therefore, the court should adopt our construction on that point. If the court were to adopt our construction slightly displaced, the court did not make any finding that Asahi would anticipate under that construction. And so claim three of the 003 patent would be valid under our construction. And there's a similar circumstance with respect to claims 20 and 37 of the 284 patent, again, under our construction. Asahi was the only basis for rejecting those claims, and so if our construction is accepted, those claims would be valid. What about the threshold issue? Talk to me about the robot reference. First pinpoint to me where that is. Ishiguro? No, there's some line at the end of your patent, I think, that refers to computers and robots. Right. So it's at column 14, I believe. No. Yeah, in the... Oh, the other patent. Yeah, in the 003 patent. Yeah, in the 1343 appeal. The column 14, starting at line 14, it's that paragraph. Yeah. And so what this is talking about is it says, it will be appreciated that systems constructed in accordance with the invention. So what that tells us is, okay, these examples are gonna be consistent with everything we've said previously in the patent. It says, okay, the invention can find utility in a number of applications, and then it lists the applications. Many of the... I think I know what you do with computer video games. What do you do with robotics? So I would say it's if you have a robot where you've got a camera on the robot, and an operator's operating the robot, but wants to see, wants to look at what the camera is displaying. So you can think of the Mars rover, for example. That's a robot that's going around the surface of Mars, and using the technology in this patent, you could display... Wait, wait. So you're contemplating that the robot controller at his computer screen has the red and green glasses on? Yep. That's right. The robots... Is that... That seems implausible. I think... Is that... I mean, is there some reason to think that's plausible? I would say in the context of... is doing this, and getting depth perception out of it. I would say that in the context of the rest of this patent, that's plausible, because the rest of the patent is all talking about human vision, and so when the sentence is preceded with in accordance with the invention, you want to try and read these examples to the extent possible to be consistent with the rest of the patent, the rest of the patent is talking about human vision. Moving to the Joinder issue, so just following up on the point you had raised initially, Judge Toronto, about consolidation, I would say, again, the board didn't reference consolidation as the basis for what it was doing here, and so the Chenery Doctrine would really kick in and prevent this court from trying to reconstrue... Well, no, because Chenery doesn't prevent upholding a decision unless upholding it would require the court to make some judgment committed to the agency, some factual or discretionary judgment. If it's perfectly clear, and I think you concede that you didn't challenge the institution, or you didn't challenge the institution, you concede, I think, at some place, that they could have consolidated them, then I don't see what act of discretion of the board or PTO, the director, whoever over there, would be interfered with by saying what they did here was an unreviewable institution together with consolidation, so we don't need to get to the Joinder issue. I think that's incorrect, Your Honor, because the board... So the reason we didn't challenge the institution, frankly, is because if the board wasn't able to join these proceedings, it couldn't have instituted the second set of IPRs. So if the board's basis for instituting the IPRs was to say, oh, well, we have authority under this Joinder provision, if this court disagrees with the interpretation of the Joinder provision, I would say it has to send it back to the agency to re-decide the institution question under the proper law. What was your objection to Joinder before the agency? It was a discretionary type of objection, so we basically said it would prejudice us because Sony's petition was too late, and there was the co-pending district court litigation, so it was an appeal to the director's discretionary ability not to join the proceedings based on the facts of this case. Another point, Judge Toronto, that you had made just about institution and Joinder. So the Joinder statute does talk about joining a party to that inter-parties review, and so I would suggest that that's consistent with the idea that the Joinder statute doesn't really contemplate a second institution at all. It just contemplates adding a party to the existing... Can I ask, either under the statute or the regulations, if a party is joined, or even I guess if a party is not joined yet, I'm not sure, tell me if it makes any difference, can claims that were not specified in the institution decision be added to the review itself, the trial as it's called? No, Judge Toronto. Is there a statute or a regulation or both that says the institution decision fixes exactly those claims that will be and can be the subject of the final written decision? I don't know that off the top of my head. My guess would be looking at the statute. These petitions address these things claim by claim, and so the board and its institution decisions looks at things claim by claim, and so I suspect we would have a statutory argument that it's a claim, validity is assessed claim by claim generally, and so the board... Right, and the question is whether, put aside the Joinder situation, whether if I file an IPR and the director says, right, I'm going to institute it on claim two, and then as we go along, he says, oh, we're going to add claim three. I don't know. I would say the director didn't do that in this case, and so this case would not implicate that question. Finally, if I could just say on jurisdiction, I'd just stress that this court has mandamus authority to review what the board did here, and I think all the questions raised about the fluctuating board positions and the various non-precedential decisions and expanded panels, et cetera, really show why this court needs to review this issue. It's a pure question of law. There should be a determinative construction of the statute, and the court can use its mandamus authority to do that. Thank you very much. How common is this kind of Joinder? Do you have any idea? I don't have that much of a sense, Judge Dyke. I mean, I would say there's been four or five decisions now out of the board on this issue fluctuating various ways, so it does come up. It does appear to come up a fair amount, but I suppose there are thousands of IPRs as well, so those would be the numbers.  Thank you.